UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LONZO L. WARREN,

               Plaintiff,

vs.

BATTLE CREEK, CITY OF,

               Defendant.

_____/

Case No. 1:12-cv-188

Hon. Robert J. Jonker

**REPORT AND RECOMMENDATION**

This matter is now before the court on defendant's motion for dismissal and for summary judgment (docket no. 39).

### I.       Plaintiff's allegations

Plaintiff filed a form complaint against defendant City of Battle Creek (sometimes referred to as the "City") alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e to 20003-17), which occurred on October 28, 2010 and March 11, 2011.  Compl. at ¶¶ 3 and 7.B.  Plaintiff alleged that the discrimination resulted in the termination of his employment, denial of a promotion or job bid, and "Denial of the same terms and conditions of employment given to other employees but denied plaintiff because of race, color, sex, religion or national origin."  *Id.* at ¶ 8.

Plaintiff set forth the following facts in support of his claim:

On or about August 27, 2010, I filed a complaint of discrimination and harassment under Title VII of the Civil Rights of 1964, (see accompanying) with the Equal Employment Opportunity Commission (EEOC).  The subsequent investigation (which did not include any of the witnesses I listed or direct co-worker's) concluded that information obtained did not establish violations of statutes.  It also concluded that the investigation could not certify defendant was in compliance with statutes.

On October 25, 2010 I was released to return to work from medical leave for work related illness and the defendant demanded that I meet first with employee Relations department before returning.  This meeting took place on October 28, 2010 with my union representative and the Director of Employee Relations.  The Employee Relations Director (Russell Claggett) refused my return to work because of concerns with my workers compensation claim and the civil rights complaint that I filed with the EEOC several months prior.  I was asked to see a [sic] independent medical evaluator at their choosing to determine my fitness to return to work.  I agreed and questioned why this unprecedented action was being taken against me with [sic] several  other white employees some of which I directly supervised were never required to have a IME after being released to return to work.  Again I was told the city had concerns with my complaints to the EEOC and workers compensation bureau.  The cities [sic] IME [Independent Medical Examination] doctor after evaluating me for 15 minutes made a determination that I was not fit to return to work for the defendant.  This resulted in me being denied promotions to other division within my employer that I was highly qualified for but was denied.  I reported this to the EEOC and their investigation determined that there was reasonable cause to believe that I was being denied return to work in retaliation for participating in protected activity in violation of Title VII.  The EEOC attempted to remedy the violations (see accompanying) through informal conciliation without success.  My complaint was then forwarded to the Department of Justice (see accompanying) and on November 30,2011 I received certified notice which I picked up from my local post office on December1, 2011 notifying me of my right to sue.  I've contacted numerous attorneys throughout the state of Michigan without success.  So I took it upon myself to file on my own and give it my best to convince the court or jury of the unlawful actions of the defendant.

*Id.* at p. 4.[1]  For his relief, plaintiff requests "[t]hat the Court grant such relief as may be appropriate, including injunctive orders, damages, costs and attorney fees" and "[t]hat the Court grant reinstatement where appropriate."  *Id.* at ¶ 13.

---

[1] The records submitted by plaintiff reflect that the EEOC dismissed plaintiff's claim in Charge No. 471-2010-02826 ("2826") and closed its file on June 28, 2011, stating in part "[b]ased on its investigation, the EEOC is unable to conclude that the information obtained established violations of the statutes."  *See* EEOC Dismissal (docket no. 1-1).  On June 29, 2011, the EEOC issued a Determination in Charge No. 471-2011-00865C, which identified plaintiff's filing of Charge No. 2826 as the protected activity which triggered plaintiff's retaliation claim.  *See* EEOC Determination (docket no. 1-2). In its Determination, the EEOC found that "the investigation did reveal there is reasonable cause to believe that the Charging Party was denied return to work in retaliation for participating in a protected activity, in violation of Title VII.  *Id.*

## II.    Defendant's Motion to Dismiss

Defendant seeks dismissal of plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6).  A motion brought pursuant to Fed. R. Civ. P. 12(b)(6) seeks to dismiss a complaint for "failure to state a claim upon which relief can be granted."   A complaint may be dismissed for failure to state a claim if it fails to give the defendants a fair notice of the claim and the grounds upon which it rests. *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007). *See* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief"). *See also*, *Twombly*, 550 U.S. at 555 ("Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests") (internal quotation marks omitted).

A plaintiff's obligation to provide the defendants with a statement of his claim requires "more than labels and conclusions." *Id.*  Rather,

> [A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotation marks omitted).  In making this determination, the complaint must be construed in the light most favorable to the plaintiff, and its well-pleaded facts must be accepted as true.  *Morgan v. Churchs Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

It is well established that "*pro se* complaints are held to even 'less stringent standards than formal pleadings drafted by lawyers.'"   *Kent v. Johnson*, 821 F.2d 1220, 1223 (6th Cir. 1987), quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  However, the duty to be "less stringent" with *pro se* complaints does not require this court to conjure up unpled allegations.  *McDonald v. Hall*, 610 F.2d 16, 19  (lst Cir. l979).  Finally, "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein."  *Bassett v. National Collegiate Athletic Association*, 528 F.3d 426, 430 (6th Cir. 2008).

Viewing plaintiff's complaint under this "less stringent" standard, plaintiff has filed an action under Title VII for race discrimination and retaliation which occurred on two dates: October 28, 2010 and March 11, 2011.  Defendant contends that plaintiff's complaint fails to state a claim under Fed. R. Civ. P. 12(b)(6) and that it also fails to comply with Fed. R. Civ. P. 8(a)(2).  The record reflects that plaintiff "checked the box" on the form complaint indicating that defendant violated Title VII because of his race, that he filed charges with the EEOC in August 2010, and that plaintiff's narrative contained in the form's "Factual Statement" is limited to alleged retaliation on October 28, 2010.  *See* Compl. at pp. 3-4.

At the hearing on defendant's motions, plaintiff had considerable difficulty articulating the basis for his federal lawsuit.  Ultimately, plaintiff stated that his claim was one for retaliation which occurred on October 28, 2010, i.e., defendant retaliated against him for filing an

EEOC claim in August 2010, by refusing to allow him to return to work without an IME.[2]  While the allegations in the complaint are sketchy, he has sufficiently identified an act of race discrimination and retaliation in violation of Title VII which allegedly occurred on October 28, 2010.

However, plaintiff's complaint does not identify any particular event that occurred on March 11, 2011.  Whatever meaning this date may hold for plaintiff, the same is not apparent from the complaint.  Under these circumstances, plaintiff has alleged no facts to state a claim to relief that is plausible on its face with respect to any event that occurred on March 11, 2011.  *See Ashcroft*, 556 U.S. at 678.  Accordingly, defendant's motion to dismiss should be **DENIED** as to plaintiff's Title VII claim for race discrimination and retaliation on October 28, 2010 and **GRANTED** with respect to all other claims.[3]

### III.    Defendant's Motion for Summary Judgment

### A.    Legal standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

---

[2] Defendant is well aware of the meeting which occurred on that date, as demonstrated by evidence filed in support of its motion for summary judgment, which included a transcript of the meeting between plaintiff, Russ Claggett (defendant's Director of Employee Relations), and Phil Lahr (plaintiff's union representative).  *See* Trans. (Oct. 28, 2010) (docket no. 40-4).

[3] Defendant's brief construed plaintiff's complaint as also including additional claims under 42 U.S.C § 1981 ("Equal Rights under the Law") and Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2202.  Defendant's Brief at p. 12.  But as discussed, plaintiff's complaint was limited to claims brought under Title VII.  It is unnecessary for the Court to consider defendant's arguments which refer to violations of other statutes which were not found in the complaint.

of law." Fed. R. Civ. P. 56(c).  In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set

forth the standard for deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to
> support the nonmoving party's case.  Once the moving party has met its burden of
> production, the nonmoving party cannot rest on its pleadings, but must present
> significant probative evidence in support of the complaint to defeat the motion for
> summary judgment. The mere existence of a scintilla of evidence to support
> plaintiff's position will be insufficient; there must be evidence on which the jury
> could reasonably find for the plaintiff.

*Copeland*, 57 F.3d  at 478-79 (citations omitted).  "In deciding a motion for summary judgment, the

court views the factual evidence and draws all reasonable inferences in favor of the nonmoving

party."  *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  However, the court is

not bound to blindly adopt a non-moving party's version of the facts.  "When opposing parties tell

two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury

could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion

for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.      Summary of Facts

Plaintiff's employment with defendant City of Battle Creek began on March 11, 1996

as a Water Meter Service person.  Russell Claggett Aff. at ¶ 4 (docket no. 40-1). Plaintiff later

became a Water Department Foreman.  Karen Diver Aff. at ¶ 3 (docket no.  40-5). A summary of

plaintiff's employment history relevant to this lawsuit appears in defendant's brief, which includes

a statement of facts supported by citations to the record. Plaintiff's response to defendant's motion

and brief was two sentences stating that he denied "all the allegations of the Defendants [sic]

pleadings including jurisdictional grounds" and that he lacked "the knowledge or information

sufficient to form a belief about the truth of Defendants allegation [sic]."  Plaintiff's Response

(docket no. 54).  However, plaintiff did not file a counter-affidavit or other evidence to dispute the

facts as recited and documented by defendant.  Rather than paraphrase defendant's uncontested

factual statement, the Court will adopt the pertinent portions of that uncontroverted statement as

follows:

> During Plaintiff's employment a number of annual evaluations included commentary on persistent problem performance areas for Plaintiff including, but not limited to, tardiness, lack of decorum, lack of respect, inappropriate statements and unprofessionalism, and attendance issues.  (Exhibit A, ¶5)  In recent years, when corrective discussion occurred, or discipline was imposed Plaintiff sought to blame others rather than to acknowledge his mistakes, performance failures, and unprofessionalism.  Although co-workers attempted to provide counsel the Plaintiff ignored or outright rejected the help and advice of his co-workers.  (Exhibit B, ¶¶7, 8, 10, 15 & Exhibit I)

> With the arrival of a new Water Superintendent came changes in the Water Meter Department.  The new Water Superintendent, Perry Hart, was not tolerant of the lackadaisical work environment that had become the culture within the department.  (Exhibit C, ¶5, and Exhibits F, L, N, and O)  Employees resisted changes such as being to work on time, following proper procedures and being respectful to vendors and administration. Many in the department, Caucasian and African-American, disliked Hart and his management style.  (Exhibit C, ¶5, and Exhibits F, L, N, and O)  Many were also well aware of Plaintiff's high level of dislike and challenging of Hart's authority, direction and change in management style to a more strict, hands-on approach.  (Exhibits E, I, B, F)  At least one employee noticed that upon Hart's arrival each morning Plaintiff would begin challenging Hart and they would push each other's buttons. (Exhibit N)

> Plaintiff's co-workers are not aware of action(s), inaction, or statements by Perry Hart, or any other City of Battle Creek supervisory personnel, made to, or regarding, Plaintiff to support any claim of race-based discrimination or race-based harassment retaliation against Lonzo Warren because of his Equal Employment Opportunity Commission (EEOC) complaints.  (Exhibits B, C, E, F, G, I, J, K, L, M, N and O)

> Plaintiff's decorum and disrespect was not isolated to Hart or City vendors and would occasionally fall upon other co-workers as he would be loud and curse as he voiced his frustrations.  (Exhibit E).  While co-workers knew that Plaintiff was not normally loud, his outbursts and behavior could be over such simple things as over-scheduling service orders and an increased work-load for Plaintiff's staff. (Exhibit E)

During the month of January 2010 Hart was concerned with timely completion of a project and had discussions with Plaintiff where Plaintiff was disrespectful to Hart. (Exhibit A, Attachment 1) During January and early February 2010 Plaintiff sent emails to a vendor that were determined to be inappropriate. (Exhibit A, Attachment 1 and Exhibit B) Hart served Plaintiff a written reprimand for the lack of decorum concerning the emails[.] (Exhibit A, Attachment 1 and Exhibits B and C) Plaintiff refused to accept the reprimand. (Exhibit A, Attachment 1 and Exhibit B) On January 27, 2010 Plaintiff called Hart who was on his way home and made accusatory and threatening statements towards Hart. (Exhibit C, ¶6)

On February 11, 2010 Hart tried to call Plaintiff to a meeting with Utilities Director Ken Kohs. (Exhibit C, ¶7) As Plaintiff never answered his office or cell phone Hart went to Plaintiff's office to tell Plaintiff to come to the meeting with his union steward. (Exhibit C, ¶7) Plaintiff proceeded to stand up, face Hart and tell Hart to get away. (Exhibit C, ¶7) Instead of meeting with Hart and Kohs, Plaintiff left work without authorization. (Exhibit C, ¶12)

Later that morning Plaintiff called the office of Employee Relations wanting to speak to Russell Claggett. (Exhibit D, ¶3) Upon hearing that Claggett was unavailable Plaintiff abruptly said goodbye and hung up only to call back a few minutes later and in speaking about Perry Hart, said: "Tell Russell I'm done, I can't take this, I'm leaving, I'm afraid I'm going to hurt Perry, I can't take this anymore, I'm done. Goodbye. . ." (Exhibit D, ¶3 and Attachment 2)

Hart remained in a conference room with Ken Kohs until after Plaintiff's phone call to Employee Relations. (Exhibit C, ¶9) Later Hart completed a violence in the workplace report and met with the Threat Management Team. (Exhibit A, ¶8 and Exhibit C, ¶11)

Plaintiff was away from his work with the City of Battle Creek on medical leave from February 16, 2010 through approximately August 16, 2010. (Exhibit A, ¶9) During this time period, Plaintiff did not lodge or file any complaints alleging discrimination against the City, or its employees. (Exhibit A, ¶9) Plaintiff had been off work on his medical leave for approximately six months, and during this time, Claggett received notice of two intervening mental illness related hospitalizations in order to substantiate continued short-term disability. (Exhibit A, ¶10) During one of the Plaintiff's mental illness related hospitalizations taking place on approximately May 17, 2010, medical records revealed that Plaintiff had expressed threats of homicidal ideations against his supervisor, Perry Hart, which indicated to Russell Claggett a continued serious threat of violence in the workplace jeopardizing Perry Hart's safety if Plaintiff were to return to work. (Exhibit A, ¶11 and Exhibit H, Attachment 3)

8

At approximately the six month mark of Plaintiff's short-term disability status, the Risk Management Department sent Plaintiff notices regarding his need to contribute to his health insurance coverage and his status under the Family Medical Leave Act (FMLA). (Exhibit A, ¶12) Soon after this notice was sent to Plaintiff, he filed his first EEOC complaint, dated August 27, 2010 alleging discrimination as the basis for his poor performance evaluation dated November 19, 2009 and a January 13, 2010 reprimand for disrespecting his supervisor, Perry Hart. (Exhibit A, ¶12) The EEOC found no cause of action. (Exhibit A, ¶12 and attachments to Plaintiff's complaint)

On or about October 22, 2010, as Plaintiff's short-term disability coverage and FMLA status were about to run out, Claggett received an email notification from Plaintiff notifying Claggett that he wanted to return to work for four hours per day. (Exhibit A, ¶13) Also attached to the email was a written return-to-work slip from Dr. Tatineni authorizing Plaintiff to return to work four hours per day beginning October 25, 2010. (Exhibit A, ¶13 and Attachment 2) When Claggett's office attempted to verify the medical basis for Plaintiff's request to return to work and that he had in fact been medically released to return to work, the stated medical provider's office advised that the psychologist had not examined Plaintiff. (Exhibit A, ¶14) Given this information, as well as the fact that the City was still conducting its due diligence of investigating Plaintiff's most recent claim against his supervisor for discrimination and harassment, as well as assessing the threat of violence in the workplace, particularly assessing the threat Plaintiff presented to his Supervisor Perry Hart considering Plaintiff's homicidal ideations; Claggett advised Plaintiff that the City would first need to verify Plaintiff's medical release before he could return to work. (Exhibit A, ¶14) Plaintiff also had not yet been provided his notice of discipline, nor had he served the discipline since he had taken off on medical leave before that could take place. (Exhibit A, ¶14)

At the time of Plaintiff's request to return to work, Claggett had not yet interviewed Plaintiff regarding the violence in the workplace complaint with him as the perpetrator and Perry Hart as the victim, because it was not his practice to do such interviews while an employee is on stress related medical leave. (Exhibit A, ¶15) Also, Claggett had not received any information from Plaintiff or his medical providers to indicate that the threat of harm no longer existed or that if Plaintiff returned to work his co-workers would be safe. (Exhibit A, ¶15)

Claggett scheduled a meeting for October 28, 2010 between himself, Plaintiff, and his union representative Phil Lahr, to discuss Plaintiff's desire to return to work, to impose his discipline of the one-day suspension that Claggett had intended to impose upon him in February of 2010 that was pre-empted by Plaintiff's medical leave and to assess whether Plaintiff still presented a threat of harm to Perry Hart. (Exhibit A, ¶15 and Exhibit I) The meeting was recorded and subsequently transcribed. (Exhibit A, and D,¶4 and Exhibit 1)

9

During the October 28, 2010 meeting, Plaintiff acknowledged that at his last meeting with Dr. Tantinini that initially Dr. Tantinini was not ready to release Plaintiff to return to work. (Exhibit A, ¶18 and Exhibit D, Attachment 1, pp 2-3). At Plaintiff's request the doctor recommended that Plaintiff go to work four hours a day and that Plaintiff continue therapy on a weekly basis. (Exhibit A, ¶18 and Attachment 2 and Exhibit D, Attachment 1.)

During the October 28, 2010 meeting, Claggett expressed to Plaintiff his concerns as to whether Plaintiff was medically able to return to work, as well as his concerns regarding Perry Hart's safety and suggested that Plaintiff undergo a fitness-for-duty exam; Plaintiff agreed at that time to undergo a fitness-for-duty exam. (Exhibit A, ¶19) Claggett's decision to request a fitness-for-duty psychological exam of Plaintiff was primarily based upon his concern regarding violence in the workplace wholly unrelated to Plaintiff's race. (Exhibit A, ¶20) The requested fitness-for-duty exam that Plaintiff agreed to undergo is entirely different from an independent medical exam undertaken regarding workers' compensation claims. (Exhibit A, ¶21) Claggett has requested fitness-for-duty psychological exams of employees other than Lonzo Warren, including those of Caucasian employees. (Exhibit A, ¶22)

The psychological examination was conducted on November 11, 2010. (Exhibit H, ¶7) Scott R. Stehouwer, Ph.D., a Licensed Psychologist personally met and examined Plaintiff. (Exhibit H, ¶7) Dr. Stehouwer determined that Plaintiff was "not able to return to gainful employment for the City of Battle Creek in any capacity because he was then suffering from severe emotional problems." (Exhibit H, ¶8 and Attachment 2) The doctor further noted that Plaintiff "posed a safety threat to the employees of the City of Battle Creek if he were to return to work at that time." (Exhibit H, ¶8 and Attachment 2) In undertaking the psychological examination of Lonzo Warren, Dr. Stehouwer reviewed a psychiatric admission report from Borgess Health Services dated May 17, 2010 (Exhibit H, ¶9 and Attachment 3)

Defendant's Brief at pp. 1-7 (docket no. 40).

While plaintiff remained off work on sick leave, he filed for duty-related disability retirement from the City, which he was eventually granted. Claggett Aff. at ¶ 25. Plaintiff has been drawing upon this retirement since January 1, 2011. *Id.* at ¶¶ 25-26.

C.      Discussion

1.      Title VII - Race Discrimination

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1).    Plaintiff's discrimination claim, as alleged in his complaint, is based upon circumstantial evidence which would support an inference of race discrimination.  To establish his claim, plaintiff

> must make a prima facie showing of discrimination under Title VII by demonstrating (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position; and (4) that a similarly-situated employee outside the protected class or classes was treated more favorably than he.

*Dodd v. Donahoe*, 715 F.3d 151, 156 (6th Cir. 2013).  If plaintiff succeeds in making out the elements of a *prima facie* case under Title VII, the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for its actions.  *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802 (1973).  If defendant satisfies its burden of production, the burden shifts back to the plaintiff to demonstrate "that the proffered reason was not the true reason for the employment decision."   *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007), quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  "Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion throughout the process."  *Dixon*, 481 F.3d at 333.

In this case, it is not disputed that plaintiff established the first element of a *prima facie* case. With respect to the second element, defendant admits that the administrative leave commencing on October 28, 2010 was an adverse action but contends that plaintiff's subsequent disability retirement was not an adverse action. Plaintiff's Brief at p. 15. With respect to the third element, a question of fact arguably exists as to whether plaintiff was qualified for his position on October 28, 2010, not in the sense of whether he knew how to perform the work, but whether he was precluded from performing the work because of a disability. Plaintiff had been on short term disability for several months prior to that date, and while Dr. Tantenini agreed to release him for part-time work on a week-to-week basis, the subsequent fitness for duty examination by Dr. Stehower found that plaintiff was not fit to work even part time at that position.

Assuming, however, for purposes of this motion, that plaintiff demonstrated the first three elements of a *prima facie* case, he has presented no evidence to support the fourth element, i.e., that a similarly-situated employee outside the protected class was treated more favorably than he was treated. While plaintiff names three individuals in his complaint whom he claims were treated differently than him, plaintiff has presented no evidence demonstrating that these individuals were similarly situated to him, were outside of the protected class, or were treated more favorably than him. Thus, plaintiff has failed to establish a prima facie case of race discrimination. Accordingly, defendants are entitled to summary judgment with respect to the race discrimination claim.

## 2.    Title VII - Retaliation

Title VII also prohibits discriminating against an employee because that employee has engaged in conduct protected by Title VII, providing that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . to discriminate against

any individual  . . .  because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."   42 U.S.C. § 2000e-3(a). Plaintiff's retaliation claim, as alleged in his complaint, is based upon circumstantial evidence which would support an inference of retaliation.   "The elements of a retaliation claim are similar but distinct from those of a discrimination claim."  *Laster v. City of Kalamazoo*,  -- F.3d --,  2014 WL 960892 at *12 (6th Cir. March 13, 2014).

> To establish a *prima facie* case of retaliation under Title VII, [p]laintiff must demonstrate that: (1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.

*Id.* (internal quotation marks omitted).

While defendant does not dispute that plaintiff met the first and second elements of a Title VII retaliation claim, it contends that plaintiff has not met the third element (a materially adverse action against him) or the fourth element (a causal connection between the protected activity and the materially adverse action).  *See* Defendant's Brief at p. 18.  The Court disagrees with defendant's contention that plaintiff failed to establish the third element of his retaliation claim because he did not suffer a material adverse action.  Placing an employee on unpaid administrative leave pending a fitness for duty evaluation can be an adverse action.  *See Brown v. Lexington-Fayette Urban County Government*, -- Fed. Appx. --,  2013 WL 6486771 at *4 (6th Cir. Dec. 11, 2013) (the government's referral of the plaintiff for a fitness-for-duty exam which resulted in her being placed on leave from July through October 2008 was an adverse action for purposes of Title VII retaliation claim).

13

The Court, however, agrees with defendant that plaintiff failed to establish the fourth element, i.e., a causal connection between the alleged retaliatory act and the alleged adverse action. The roots of the present controversy extend back to February 11, 2010, when plaintiff telephoned Ms. Dickerson advising her that he was afraid he was going to hurt his supervisor, Perry Hart, and that he was "done." Claggett Aff. at ¶ 7. This communication initiated a "violence in the workplace investigation" through Claggett's Office with plaintiff as the perpetrator and Hart as the victim. *Id.* Claggett described the investigation as follows:

> As is standard City of Battle Creek procedure, when there is a threat of violence, the threat management team of then Deputy Chief of Police Jackie Hampton, Human Resources Manager Paul Engels, and Risk Manager Rick Hensley, met with Perry Hart to complete and file a Violent Incident threat Report Form. I then reviewed the report investigated the incident concluding that there was a valid risk to the safety of Perry Hart or other co-workers.

*Id.* at ¶ 8 (internal citation omitted).

After issuing this threat, plaintiff was away from work on medical leave for half a year, from February 16, 2010 through approximately August 16, 2010. *Id.* at ¶ 9. While plaintiff was off of work on his medical leave, Claggett's office received notice of two intervening mental illness related hospitalizations during this six-month period which substantiated plaintiff's continued short-term disability. *Id.* at ¶ 10. During plaintiff's mental illness related hospitalization on or about May 17, 2010, medical records indicated that plaintiff had expressed "threats of homicidal ideations against his supervisor, Perry Hart." *Id.* at ¶ 11. These threats indicated to Claggett that plaintiff posed "a continued serious threat of violence in the workplace jeopardizing Perry Hart's safety if [p]laintiff were to return to work." *Id.* Claggett stated that at approximately the six month mark of plaintiff's short-term disability status, defendant's Risk Management Department sent plaintiff notices regarding his need to contribute to his health insurance coverage and his status under the

14

Family Medical Leave Act (FMLA). *Id.* at ¶ 12. Soon after this notice was sent to plaintiff, he filed his EEOC complaint dated August 27, 2010, "alleging discrimination as the basis for his poor performance evaluation dated November 19, 2009 and a January 13, 2010 reprimand for disrespecting his supervisor, Perry Hart." *Id.*

On or about October 22, 2010, "as [p]laintiff's short-term disability coverage and FMLA status were about to run out," Claggett received an e-mail from plaintiff notifying Claggett that plaintiff wanted to return to work for four hours per day. *Id.* at ¶ 13. Attached to the e-mail was a written return-to-work slip from Dr. Tatineni, authorizing plaintiff to return to work for four hours per day beginning October 25, 2010. *Id.*

Claggett described the outstanding issues which needed to be addressed when plaintiff requested to return to work:

> When my office attempted to verify the medical basis for [p]laintiff's request to return to work and that he had in fact been medically released to return to work, the stated medical provider's office advised that the psychologist had not examined [p]laintiff. Given this information, as well as the fact that the City was still conducting its due diligence of investigating [p]laintiff's most recent claim against his supervisor for discrimination and harassment, as well as assessing the threat of violence in the workplace, particularly assessing the threat [p]laintiff presented to his Supervisor Perry Hart considering his homicidal ideations; I advised [p]laintiff that the City would first need to verify [p]laintiff's medical release before he could return to work. Plaintiff also had not yet been provided his notice of discipline [i.e., a one day suspension notice for plaintiff's insubordination and inappropriate communication with outside vendors which Claggett was going to give to plaintiff on February 16, 2010], nor had he served the discipline since he had taken off on medical leave before that could take place.

> \*       \*       \*

> At the time of [p]laintiff's request to return to work, I had not yet interviewed [p]laintiff regarding the violence in the workplace complaint with him as the perpetrator and Perry Hart as the victim, because it was not my practice to do such interviews while an employee is on stress related medical leave. Also, I had not received any information from [p]laintiff or his medical providers to indicate that the

15

threat of harm no longer existed or that if [p]laintiff returned to work his co-workers
would be safe.

*       *       *

I scheduled a meeting for October 28, 2010 between myself, [p]laintiff Lonzo
Warren, and his union representative Phil Lahr, to discuss [p]laintiff's desire to
return to work, to impose his discipline of the one-day suspension that I had intended
to impose upon him in February of 2010 which was pre-empted by [p]laintiff's
medical leave and to assess whether [p]laintiff still presented a threat of harm to
Perry Hart. The meeting was recorded and subsequently transcribed.

*Id.* at ¶¶ 14, 15 and 16.

During the October 28, 2010 meeting, Claggett summarized the issues related to

plaintiff's return to work:

[O]ne of the concerns that I had was with the original diagnosis that we had gotten
from Dr. Tatineni, coupled with the allegations that you made in your workers comp
claim, your civil rights claim, and then the emails you had sent to me regarding your
concern about a hostile work environment, um, discrimination, your request to be
transferred from the assignment that you currently have. Um, our concern was . .
. is bringing you back right now 4 hours in that same environment that you have
complained about, um, a good thing for both you and the City. So we talked to Dr.
Tatinini's [sic] Office on Monday, or Tuesday, I guess . . I am not comfortable with
the response that they gave us. They told us that Dr. Tantinini [sic] did not see you,
that he did not do an evaluation before recommending that you be returned 10 work
for 4 hours

*       *       *

. . . So based on what we heard from the doctor's office, our feeling was that we
really wanted you to see someone independent, kind of like a fitness for duty kind
of thing but if I can get some information from Dr. Tantinini [sic], um, then maybe
we don't have to do that. . .

Trans. (Oct. 28, 2010) (docket no. 40-4 at pp. 4 and 7).

A factual issue arose regarding whether Dr. Tatenini had actually evaluated plaintiff

prior to writing the return to work note. Plaintiff stated that during the course of a 10-minute

conversation, the doctor agreed to allow him to work for a week.  *Id.* at pp. 5-6.  Claggett addressed

the issue as follows:

> Absent that [i.e., obtaining additional information from Dr. Tantenini], if we get different information then what you have told me or were concerned about that then we will either be in a position where we say okay, we will accept the restrictions and we will try it to see how it goes.  Or we will say we are not comfortable with the restrictions or we will talk about, in order for us to get comfortable, what we would like you to do is go for a fitness for duty evaluation to an independent doctor.  So that is where we are with that stuff.   Pending that, I am going to continue you on your administrative leave, I am not comfortable to put you back to work until we are all on the same page.  But, we do need to start addressing the issues that were occurring back in February [2010]when you went off.  At the time that  . . . the day that you left work, I know that you had a meeting scheduled with Perry Hart and the purpose of that meeting was to issue disciplinary action. That meeting obviously didn't take place and you haven't been back to work since that date.  I am going to give you the disciplinary action that was scheduled to be given to you that day.

*Id.* at p. 7.

During the course of the conversation, plaintiff expressed apparent agreement with

obtaining an independent evaluation:

> Maybe we need to get an independent evaluation to maybe make everyone feel a lot better.  If you had an independent evaluation, if you do that, and they would say I's fit for work.  Or not fit for work.   If they say I'm not fit for work, that's going to make the case for the workers compensation a lot better for the City [sic].  That is just how that goes [sic].

*Id.* at p. 8.

At this point, Claggett explained the difference between a fitness for duty

examination and an independent medical examination:

> [I]f the workers camp case is contested, you will go for an IME and sure the results of that are going to impact whatever case is there.  And there are multiple issues there.  The multiple issues are #1, are your suffering from the condition that is alleged and if so, is that condition either caused or aggravated by the work situation. So there are a couple of different issues there.  I am more concerned right now with putting you back in a work environment when I've got a civil rights complaint

17

pending and the emails from you requesting transfer because you . . .  basically you
don't want to work for Perry Hart[.]

*Id.* at pp. 8-9.

Two weeks later, Dr. R. Scott Stehouwer, a psychologist, evaluated plaintiff to
determine whether plaintiff was psychologically fit to return to work and whether plaintiff presented
a threat to the safety of his co-workers.  Stehower Aff. at ¶ 7 (docket no. 41-3).  Based on his
examination of plaintiff and a review of plaintiff's medical record, Dr. Stehouwer prepared a 21-
page Psychological Evaluation Report, in which he  diagnosed plaintiff with "major depression,
recurrent, severe, without psychotic features" and "personality disorder NOS with narcissistic and
paranoid personality traits."  Psychological Evaluation Report at p. 20 (Nov. 12, 2010) (docket no.
41-3). The doctor also concluded that plaintiff was not fit to return to work:

The results of the psychological evaluation are very clear and very consistent in
indicating that Mr. Warren has attempted to present himself in an unrealistically
favorable way.  He was clearly evasive and deceptive in the evaluation in order to
distort the results of the evaluation.  His goal is to inappropriately return to work.
In spite of his denial, distortion, and evasiveness, the results of the evaluation clearly
indicate that Mr. Warren is experiencing severe emotional problems.   He
demonstrates a recurrent pattern of severe depression and he also demonstrates a
problematic personality style. Mr. Warren demonstrates serious problems with anger
and resentment. He does not demonstrate evidence of Posttraumatic Stress Disorder,
but he certainly does demonstrate severe depression.

Of significant concern, Mr. Warren demonstrates a consistent pattern of
denying any culpability for problems at work or problems in his attitude or his
behavior at work or elsewhere.  He clearly denies any problem with anger.  He
clearly denies any plan or intent of a homicidal nature and he even denies ever
experiencing any homicidal ideation; something directly contradicted by the records
in this case.

\*       \*       \*

The results of the evaluation indicate that in spite of Mr. Warren's evasiveness and
outright attempt to distort the results of the evaluation, he clearly experiences severe
emotional problems.  Certainly, from an, emotional standpoint he is not able to return

18

to work.  He is not able to return to gainful employment for the City of Battle Creek whatsoever.

\*      \*      \*

Significant concern is raised about Mr. Warren posing a threat to others at his place of employment, especially toward his supervisor.  Again, the results of the evaluation clearly indicate that Mr. Warren is attempting to distort the outcome so as to inappropriately return to work when he should definitely not return to work.  From an emotional standpoint this man is disabled and he is not fit to return to work for the City of Battle Creek on any basis, be if part-time or full time.  Further, the results of the evaluation raise significant concern that Mr. Warren may well pose a threat to the employees of the City of Battle Creek, Michigan.

*Id.* at pp. 20-21.  While plaintiff remained off work on sick leave, he filed for duty-related disability retirement from the City, which he was eventually granted.  Claggett Aff. at ¶ 25.  Plaintiff has been drawing upon this retirement since January 1, 2011.  *Id.* at ¶¶ 25-26.

Based on this record, the Court concludes that plaintiff has failed to establish causation.  The transcript of the October 28, 2010 meeting demonstrates that defendant's driving forces for requiring plaintiff to obtain a fitness for duty evaluation were plaintiff's work history and his own past threats against Perry Hart, the violence in the workplace investigation, and Dr. Tatineni's cursory note allowing plaintiff back to work for four hours per day, which, given the gravity of the threat posed by plaintiff, Claggett deemed it as insufficient to demonstrate plaintiff's fitness for duty.  In addition, plaintiff's recent medical history, included an extended medical leave, two hospitalizations related to mental illness, and homicidal ideations expressed against Hart.  Finally, plaintiff's apparent agreement to have an independent evaluation cannot be overlooked (although admittedly he may not have understood the difference between an IME for a workers compensation claims and a fitness for duty evaluation).

The Court looks for guidance at the Sixth Circuit's opinion in *Lindsay v. Yates*, 578 F.3d 407, 418 (6th Cir. 2009), which addressed causation based on suspicious timing of an alleged retaliatory act:

> Causation can be proven indirectly through circumstantial evidence such as suspicious timing. Specifically, this Court has found that temporal proximity between an assertion of Title VII rights and a materially adverse action, is sufficient to establish the causal connection element of a retaliation claim "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity." Where the nexus is not "very close," we have declined to find a causal connection based on timing alone.

*Lindsay*, 578 F.3d at 418–19 (citations and parenthetical explanations omitted). Here, plaintiff filed his EEOC complaint on or about August 27, 2010. While it is not clear exactly when defendant became aware of this complaint, the alleged retaliation occurred on October 28, 2010, two months after the complaint was filed. Plaintiff has failed to demonstrate that the alleged adverse action occurred "very close" in time after defendant learned of the protected activity, particularly where defendant had no occasion to require a fitness for duty evaluation until such time as plaintiff expressed some desire, after a half a year, to return to work. In the absence of such evidence, the Court cannot find causation based on temporal proximity. Viewing the evidence in the light most favorable to the non-moving party (plaintiff), the Court concludes that plaintiff has not demonstrated a *prima facie* case of retaliation under Title VII.

Moreover, even if this Court assumes for purposes of discussion that plaintiff had demonstrated a *prima facie* case of retaliation (or, for that matter, racial discrimination), defendant articulated a legitimate, nondiscriminatory reason for its actions. *See McDonnell Douglas*, 411 U.S. at 802. Defendant contends that plaintiff was placed on administrative leave based upon a well-founded concern by Russell Claggett that plaintiff was not fit to return to work. This concern was

based upon plaintiff's past threat of violence in the workplace and whether plaintiff was fit for duty following his leave of absence, hospitalizations and current diagnosis. The undisputed record which has been placed before the Court establishes that plaintiff was found to be both unfit for duty and a threat to other employees based upon Dr. Stehower's evaluation, which was conducted two weeks after the October 28, 2010 meeting.  In his Psychological Evaluation Report issued on November 12, 2010, Dr. Stehower determined that plaintiff was not fit to return to work, specifically finding that "Mr. Warren may well pose a threat to the employees of the City of Battle Creek, Michigan." Plaintiff has not demonstrated that this concern related to plaintiff's threat of violence and fitness for duty "was not the true reason for the employment decision." *See Dixon*, 481 F.3d at 333.  In this regard, the Court notes that plaintiff went on disability retirement less than two months after Dr. Stehower's evaluation, and remains on disability.  Accordingly, defendant's motion for summary judgment should be granted as to plaintiff's remaining claims of racial discrimination and retaliation.

## IV.    RECOMMENDATION

For these reasons, I respectfully recommend that defendant City's motion to dismiss (docket no. 39) be **DENIED** as to plaintiff's claims for race discrimination and retaliation arising from the October 28, 2010 meeting and **GRANTED** as to all other claims.

I further recommend that defendant's motion for summary judgment (docket no. 39) be **GRANTED** as to plaintiff's claims for race discrimination and retaliation arising from the October 28, 2010 meeting and that plaintiff's complaint be **DISMISSED.**

Dated:  April 30, 2014                              /s/ Hugh W. Brenneman, Jr.
                                                    HUGH W. BRENNEMAN, JR.
                                                    United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).